Story, J.
(dissenting.) — In this case, I have the misfortune to differ in opinion from my brethren ; and as the grounds of the decree were fully stated in an opinion delivered in the court below, I shall make no apology for reading it in this place.
“ This is a prize allegation filed by the district-attorney, in behalf of the United States, and of John Delano, against 550 tons of pine timber, part of the cargo of the American ship Emulous, which was seized as enemies’ property, about the 5th day of April 1813, after the same had been discharged from said ship, and while afloat in a creek or dock at New Bedford, where the tide ebbs and flows.
“ From the evidence in this case, it appears, that the ship Emulous is owned by the said John Delano, John Johnson, Levi Jenny and Joshua Delano, of New Bedford) and citizens of the United States. On the 3d day of February 1812, the owners, by their agents, entered into a charter-party with Elijah Brown, as agent of Messrs. Christopher Idle, Brother & Co., and James Brown, of London, merchants, for said ship, to proceed from the port of Charleston, South Carolina (where the ship then lay), to Savannah, in Georgia, and there take on board a cargo of timber and staves, at a cer*1301 bain stipulated in the charter-party, and proceed with the J same to Plymouth, England, “ for orders to unload there, or at any other of his majesty’s dock-yards in England.” The ship accordingly proceeded to Savannah, took on board the agreed cargo, and was there stopped by the embargo laid by congress on the 4th of April 1812. On the 25th of the same April, it was agreed between Mr. E. Brown and the master of the ship, that she should proceed with the cargo to, and lay at New Bedford, without prejudice to the charter-party. The ship accordingly proceeded for New Bedford, and arrived there, in the latter part of May 1812, where, it seems, the cargo was finally, but the particular time is not stated, unloaded by the owners of the ship, the staves put into a warehouse, and the timber into a salt-water creek or dock, where it has ever since remained, waterborne, under the custody of said John Delano, by whom the subsequent seizure was made, for his own benefit and the benefit of the United States. On the 7th of November 1812, Mr. Elijah Brown, as agent for the British owners (one of whom, James Brown, is his brother), sold the whole cargo to the present claimant, Mr. Armitz Brown (who it should seem is also his brother), for $2433.67, payable in nine months, for which the claimant gave his note accordingly. The master of the ship, Capt. Allen, swears that, at the time of entering into the charter-party, Mr. Elijah Brown stated to him, that the British owners had contracted with the British gov- *84 eminent to furnish a large quantity of timber, to be delivered in some of his majesty’s dock-yards.
“ Besides the claim of Mr. Brown, there is a claim interposed by the owners of the ship Emulous, praying for an allowance to them cf their expenses and charges in the premises.
“ A preliminary exception has been taken to the libel, for a supposed incongruity in blending the rights of the United States and of the informer, in the manner of a qui tarn, action at the common law. I do not think this exception is entitled to much consideration. It is,‘at most, but an irregularity, which cannot affect the nature of the proceedings, or oust the jurisdiction of this court. If the informer cannot legally *take any interest, the «... United States have still a right, if their title is otherwise well founded, *- to claim a condemnation : nor would a proceeding of this nature be deemed a fatal irregularity, in courts having jurisdiction of seizures, whose proceedings are governed by much more rigid rules than those of the admiralty. It is a principle clearly settled at the common law, that any person might seize, uncustomed goods to the use of himself and the king, and thereupon inform of the seizure ; and if, in the exchequer, the informer be not entitled to any part, the whole shall, on such information, be adjudged to the king. For this doctrine we have the authority of Lord Hale (Harg. Law Tracts 227), and the solemn judgment of the court in Roe v. Roe, Hardr. 185, and Malden v. Bartlett, Parker 105. The same rule most undoubtedly exists in the prize court, and, as I apprehend, applies with greater latitude. All property captured belongs originally to the crown ; and individuals can acquire a title thereto, in no other manner than by grant from the crown. The Elsebe, 5 Rob. 178 ; 11 East 619 ; The Maria Erancoise, 6 Rob. 282. This, however, does not preclude the right to seize; on the contrary, it is an indisputable principle in the English prize courts, that a subject may seize hostile property, for the use of the crown, wherever it is found ; and it rests in the discretion of the crown, whether it will or will not ratify and consummate the seizure, by proceeding to condemnation. But to the prize court it is a matter of pure indifference, whether the seizure proceeded originally from the crown, or has been adopted by it; and whether the crown -would take jure coronee, by its transcendant prerogative, or jure admiralitatis, as a flower annexed by its grant to the office of lord high admiral. The cases of captures by non-commissioned vessels, by commanders on foreign stations, anterior to war, by private individuals, in port or on the coasts, and by naval commanders on shore on unauthorized expeditions, are all very strong illustrations of the principle. The Aquila, 1 Rob. 37 ; The Twee Gesuster, 2 Ibid. 284, note ; The Rebeckah, 1 Ibid. 227 ; The Gertruyda, 2 Ibid. 211; The Melomane, 5 Ibid. 41 ; The Charlotte, 4 Ibid. 282 ; The Richmond, 5 Ibid. 325 ; Thorshaven, 1 Edw. 102; Hale, in Harg. Law Tracts, ch. 28, p. 245. And in cases where private captors seek condemnation to themselves, it is the settled course of the court, on failure of their title* to decree *condemnation to the crown or the admiralty, as the circumstances require. The Walsingham Packet, 2 Rob. 77 ; The Etrusco, 4 Ibid. 262, note ; and the cases cited supra.
“ Nor can I consider these principles of the British courts a departure from the law of nations. The authority of Puffendorf and Vattel are introduced, to show that private subjects are not at liberty to seize the property *85 of enemies, without the commission of the sovereign, and if they do, they are considered as pirates. But when attentively considered, it strikes me, that, taking the full scope of these authors, they will not be found to support so broad a position. Puff. lib. 8, ch. 6, § 21 ; Vattel, lib. 3, ch. 15, § 223-27. Vattel himself admits (§ 224) that the declaration of war, which enjoins the subjects at large to attack the enemy’s subjects, implies a general order ; and that to commit hostilities on our enemy, without an order from our sovereign, after the war, is not a violation so much of the law of nations as of the public law applicable to the sovereignity of our own nation (§ 225). And he explicitly states (§ 22G), that, by the law of nations, when once two nations are engaged in war, all the subjects of the one may commit hostilities against those of the other, and do them all the mischief anthorized by the state of war. All that he contends for is, that though, by the declaration, all the sirbjects in general are ordered to attack the enemy, yet that, by custom, this is usually restrained to persons acting under commission ; and that the general order does not invite the subjects to undertake any offensive expedition without a commission or particular order (§ 227); and that if they do, they are not usually treated by the enemy in a manner as favorable as other prisoners of war (§ 226). And Vattel (§ 227) explicitly declares, that the declaration of war ‘ authorizes, indeed, and even obliges, every subject, of whatever rank, to secure the persons and things belonging to the enemy, when they fall into his hands.’ And he then goes on to state cases in which the authority of the sovereign may be presumed (§ 228). The whole doctrine of Vattel, fairly considered, amounts to no more than this, that the subject is not required, by the mere declaration of war, to originate predatory expeditions against the enemy ; that he is not authorized to wage war, contrary to the will of his own sovereign ; and that, though the ordinary declaration of war imports a general authority to attack the enemy *and his property, yet custom has so far restrained J its meaning, that it is, in general, confined to persons acting under the particular or constructive commission of the sovereign. If, therefore, the subject do undertake a predatory expedition, it is an infringement'of the public law of his own country, whose sovereignty he thus invades, but it is not a violation of the law of nations, of which the enemy has a right to complain. But if the property of the enemy fall into the hands of a subject, he is bound to secure it.
“For every purpose applicable to the present case, it does not seem necessary to controvert these' positions ; and whatever may be the correctness of the others, I am perfectly satisfied, that the position is well founded, that no subject can legally commit hostilities, or capture property of an enemy, when, either expressly or constructively, the sovereign has prohibited it. But suppose, he does, I would ask, if the sovereign may not ratify his proceedings ; and thus, by a retroactive operation, give validity to them ? Of this, there seems to me no legal doubt. The subject seizes at his peril, and the sovereign decides, in the last resort, whether he will approve or disapprove of the act. Thorshaven, 1 Edw. Adm. 102.
“ The authority of Puffendorf is still less in favor of the position of the claimant’s counsel. In the section cited (lib. 8, ch. 6, § 21), Puffendorf considers the question to whom property captured in war belongs ; a question also examined by Vattel in the 229th section of the book and chapter above *86 referred to. In tbe course of that discussion, Puffendorf observes, ‘ that it may be very justly questioned, whether everything taken in war, by private hostilities, and by the bravery of private subjects that have no commission to warrant them, belongeth to them that take it. For this is also a part of the war, to appoint what persons are to act in a hostile manner against the enemy, and how far : and in consequence, no private jDerson hath power to make devastations in an enemy’s country, or to carry off spoil or plunder, without permission from his sovereign : and the sovereign is to decide how far private men, when they are permitted, are to use that liberty of plunder ; and whether they are to be the sole proprietors in the booty, or only to share a part of it: so that all a private adventurer in war can pretend to, is no more than *what his sovereign will please to allow him ; for to be a r;);, „, soldier and to act offensibly, a man must be commissioned by public L authority.’ As to the point upon which Puffendorf here expresses his doubts, I suppose, that no person,' at this day, entertains any doubts. It is now clear, as I have already stated, that all captures in war enure to the sovereign, and can become private property only by his grant. But is there anything in Puffendorf to authorize the doctrine, that the subject, so seizing property of the enemy, is guilty of a very enormous crime — of the odious crime of piracy ? And is there, in this language, anything to show that the sovereign may not adopt the acts of his subjects, in such a case, and give them the effect of full and perfect ratification ? It has not been pretended, that I recollect, that Grotius supports the position contended for. To me it seems pretty clear, that his opinions lean rather the other way, viz., to support the indiscriminate right of captors to all property captured by them. Grotius, lib. 3, ch. 6, § 2, § 10, § 12.
“ Bynkershoek has not discussed the question in direct terms. In one place (Bynlc. Pub. Juris, eh. 3), he says, that he is not guilty of any crime, by the laws of war, who invades a hostile shore, in hopes of getting booty. It is true, that in another place (Ibid. ch. 20), he admits, in conformity to his doctrine elsewhere (Ibid. ch. 17), that if an uncommissioned cruizer should sail for the purpose of making hostile captures, she might be dealt with as a pirate, if she made any captures except in self-defence. But this he expressly grounds upon the municipal edicts of his own country in relation to captures made by its own subjects. And he says, every declaration of war not only permits but expressly orders all subjects to injure the enemy by every possible means ; not only to avert the danger of capture, but to capture and strip the enemy of all his property. And, looking to the gen eral scope of his observations (Ibid. ch. 3, 4, 16, 17), I think, it may, not unfairly, be argued, that independent of particular edicts, the subjects of hostile nations might lawfully seize each other’s property, wherever found : at least, he states nothing from which it can be inferred that the sovereign might not avail himself of property captured from the enemy by uncommissioned subjects.
“ On *the whole, I hold, that the true doctrine of the law of nations, r*. found in foreign jurists, is, that private citizens cannot acquire to L themselves a title to hostile property, unless it is seized under the commission of their sovereign; and that, if they depredate upon the enemy, they act upon their peril, and may be liable to punishment, unless their acts are adopted by their sovereign. That, in modern times, the mere declara *87 tion of war is not supposed to clothe the citizens with authority to capture hostile property, but that they may lawfully seize hostile property, in their own defence, and are bound to secure, for the use of the sovereign, all hostile property which falls into their hands. If the principles of British prize law go further, I am free to say, that I consider them as the law of this country.
“ I have been led into this discussion of the doctrine of foreign jurists, further than I originally intended; because the practice of this court in prize proceedings must, as I have already intimated, be governed by the rules of admiralty law, disclosed in English reports, in preference to the mere dicta of elementary writers. I thought it my duty, however, to notice these authorities, because they seem generally relied on by the claimant’s counsel. In my judgment, the libel is well and properly brought; at least, for all the purposes of justice between the parties'before the court; and I overrule the exception taken to its sufficiency.
“ Having disposed of this objection, I come now to consider the objection made by the United States against the sufficiency of the claim of Mr. Brown ; and I am entirely satisfied, that his claim must be rejected. It is a well-known rule of the prize court, that the onus probandi lies on the claimant : he must make out a good and sufficient title, before he can call upon the captors to show any ground for the capture. The Walsingham Packet, 2 Rob. 77. If, therefore, the claimant make no title, or trace it only by illegal transactions, his claim must be rejected, and the court left to dispose of the cause, as the other parties may establish their rights. In the present case, Mr. Brown claims a title by virtue of a contract and sale, made by alien enemies, since the war : I say, by alien enemies ; for it is of no importance what, the character of the agent is ; the transaction *must have the same legal construction as though made by the aliens themselves. Now, admitting that this sale was not colorable, but bond fide, which, however, I am not, at present, disposed to believe, still it was a contract made with enemies, pending a known war ; and therefore invalid. No principle of national or municipal law is better settled, than that all contracts with an enemy, made during Avar, are utterly void. This principle has grown hoary under the reverend respect of centuries (19 Edw. IV. 6, cited Theol. Dig. lib. 1, ch. 6, § 21. Ex parte Bonsmaker, 13 Ves. jr. 71; Briston v. Towers, 6 T. R. 45), and cannot now be shaken, without uprooting the very foundations of national' law. Bynk. Quffist. Pub. Juris, ch. 3. *136]
“I, therefore, altogether reject the claim interposed by Mr. Brown. What, then, is to be done with the property ? It is contended, on the part of the United States, that it ought to be condemned to the United States, with a recompense, in the nature of salvage, to be awarded to Mr. Delano. On the part of the claimant’s counsel (who, under the circumstances, musíbe considered as arguing as amicus curice to inform the conscience of the court), it is contended, 1. That this court, as a court of prize, has no proper jurisdiction over the cause. 2. That if it have jurisdiction, it cannot award condemnation to the United States, for several reasons. 1st. Because, by" the law of nations, as now understood, no government can lawfully confiscate the debts, credits or visible property of alien enemies, which have been contracted or come into the country during peace; 2d. Because, if the law of nations does not, the common law does afford such immunity from con *88 fiscation to property situated like the present; 3d. Because, if the right to confiscate exist, it can be exercised only by a positive act of congress, who have not yet legislated to this extent; 4th. Because, if the last position be not fully accurate, yet, at all events, this process, being a high preroga tive power, ought not to be exercised, except by express instructions from the president, which are riot shown in this case.
“ Some of these questions are of vast importance and most extensive operation ; and I am exceedingly obliged to the gentlemen who have argued them with so *much ability and learning, for the light which they have thrown upon a path so intricate and obscure. I have given L these questions as much consideration as the state of my health and the brevity of time would allow; and I shall now give them a distinct and separate discussion, that I may, at least, disclose the sources of my errors, if any, and enable those who unite higher powers of discernment, with more extensive knowledge, to give a more exact and just opinion.
“ And first, as to the jurisdiction of this court in matters of prize. This depends partly on the prize act of 26th June 1812, ch. 107, § 6, and partly on the true extent and meaning of the admiralty and maritime jurisdiction conferred on the courts of the United States. The act of 26th June 1812, ch. 107, provides, that in all cases of captured vessels, goods and effects, which shall be brought within the jurisdiction of the United States, the district court shall have exclusive original cognisance thereof, as in civil causes of admiralty and maritime jurisdiction. The act of 18th June 1812, ch. 102, declaring war, authorizes the president to issue letters of marque and reprisal to private armed ships, against the vessels, goods and effects of the British government and its subjects ; and to use the whole land and naval force of the United States to carry the war into effect. In neither of these acts, is there any limitation as to the places where captures may be made, on the land or on the seas ; and of course, it would seem that the right of the courts to adjudicate respecting captures would be co-extensive with such captures, wherever made, unless the jurisdiction conferred is manifestly confined by the former act to captures made by private aimed vessels. It is not, however, necessary closely to sift this point, as it may now be considered as settled law, that the courts of the United States, under the judicial act of 30th September 1789, ch. 20, have, by the delegation of all civil causes of admiralty and maritime jurisdiction, at least, as full jurisdiction of all causes of prize as the admiralty in England. Glass et al., v. The Sloop Betsey et al., 3 Dall. 6 ; Talbot v. Jansen, Ibid. 133 ; Penhallow et al. v. Doane's Administrators, Ibid. 54 ; Jennings v. Carson, 4 Cranch 2.
“ Over what captures, *then, has the admiralty jurisdiction as a ^ prize court ? This is a question of considerable intricacy, and has >- not as yet, to my knowledge, been fully settled. It has been doubted, whether the admiralty has an inherent jurisdiction of prize, or obtains it by virtue of the commission uaually issued on the breaking out of war. That the exercise of the jurisdiction is of very high antiquity and beyond the time of memory, seems to be incontestible. It is found recognized in various articles of the black book of the admiralty, in public treaties and proclamations of a very early date, and in the most venerable relics of ancient jurisprudence. See Rob. Coll. Marit., Intro. p. 6, 7 ; Ibid., Instructions, 3 Hen. VIII. p. 10, art. 18, &c.; Ibid. p. 12, note ; Edw. III., A. D. 1343 ; *89 Treaty Hen. VII. and Charles VIII., A. D. 1497 ; Rob. Coll. Marit. p. 83, and p. 98, art. 8 ; Ibid. p. 189, note ; Roughton, art. 19, 20, &c., passim. In Lindo v. Rodney, 2 Doug. 613, note, Lord Mansfield, in discussing the subject, admits the immemorial antiquity of the prize jurisdiction of the admiralty ; but leaves it uncertain, whether it was coeval with the instance jurisdiction, and whether it is constituted by special commission, or only called into exercise thereby. After the doubts of so eminent a judge, it would not become me to express a decided opinion. But taking the fact that, in the earliest times, the jurisdiction is found in the possession of the admiralty, independent of any known special commission; that, in other countries, and especially in France, upon whose ancient prize ordinances the administration of prize law seems, in a great measure to have been modelled (Vide Ordon. of France, A. D. 1400, Rob. Coll. Marit. p. 75; Ordon. of France, A. D. 1584, Ibid. p. 105 ; Treaty Henry VIL and Charles VIII., Ibid. p. 83, and Rob. note, Ibid. 105), the jurisdiction has uniformly belonged to the admiralty ; there seems very strong reason to presume that it always .constituted an ordinary, and not an extraordinary, branch of the admiralty powers and so I apprehend it was considered by the supreme court of the United States, in Glass et al. v. The Betsey, 3 Dall. 6.
“However this question may be, as to the right of the admiralty to take cognisance of mere captures made on the land, exclusively by land forces, as to which I give no opinion, it is very clear, that its jurisdiction is not *1391 *confined to mere captures at sea. The prize jurisdiction does not J depend upon locality, but upon the subject-matter. The words of the prize commission contain authority to proceed upon all and all manner of captures, seizures, prizes and reprisals of all ships and goods that are and shall be taken. The admiralty, therefore, not only takes cognisance of all captures made at sea, in creeks, havens and rivers, but also of all captures made on land, where the same have been made by a naval force, or by co-operation with a naval force. This exercise of jurisdiction is settled by the most solemn adjudications. Key and Hubbard v. Pearse, cited in Le Caux v. Eden, 2 Doug. 606 ; Lindo v. Rodney, Ibid. 613, note ; The Capture of the Cape of Good Hope, 2 Rob. 274 ; The Stella del Norte, 5 Ibid. 349 ; The Island of Trinidad, Ibid. 92; Thorshaven, 1 Edw. 102 ; The Capture of Chrinsurah, 1 Acton 179 ; The Rebeckah, 1 Rob. 227 ; The Gertruyda, 2 Ibid. 211 ; The Maria Francoise, 6 Ibid. 282.
“ Such, then, being the acknowledged extent of the prize jurisdiction of the admiralty, it is, at least, in as ample an extent, conferred on the courts of the United States. For the determination, therefore, of the case before the court, it is not necessary to claim a more ample jurisdiction ; for the capture or seizure, though made in port, was made while the property was water-borne. Had it been landed and remained on land, it would have deserved consideration, whether it could have been proceeded against as prize, under the admiralty jurisdiction, or whether, if liable to seizure and condemnation in our courts, the remedy ought not to have been pursued by a process applicable to municipal confiscations. On these points I give no opinion. See the case of The Oester Eems, cited in The Two Friends, 1 Rob. 284, note; Hale, de Portibus Maris, &c., in Harg. Law Tracts, ch. 28, p. 245, &c.; Parker 267.
“ Having disposed of the question as to the jurisdiction of this court, *90 I come to one of a more general nature; viz : Whether, by the modern law of nations, the sovereign has a right to confiscate the debts due to his enemy, or the goods of his enemy found within his territory at the commencement of the war ? I might spare myself the consideration of the question as to debts ; but, as it *has been ably argued, I will submit some views p,,. respecting it, because they will illustrate and confirm the doctrine L applicable to goods. It seems conceded, and indeed, is quite too clear for, argument, that, in former times, the right to confiscate debts was admitted as a doctrine of national law. It had the countenance of the civil law (Dig. lib. 41, tit. 1 ; Ibid. lib. 49, tit. 15), of Grotius (De jure belli et pacis, lib. 3, ch. 2, § 2, ch. 6, § 2, ch. 7. § 3, 4, ch. 13, § 1, 2), of Puffendorff (De jure Nat. et Nat. lib. 8, ch. 6, § 23), and lastly, of Bynkershoek (Qusest. Pub. Juris, lib. 1, ch. 7), who is himself of the highest authority, and pronounces his opinion in the most explicit manner.
“ Down to the year 1737, it may be considered as the opinion of jurists, that the right was unquestionable. It is, then, incumbent on those who assume a different doctrine, to prove, that, since that period, it has by the general consent of nations, become incorporated into the code of public law. I take it upon me to say, that no jurist of reputation can be found who has denied the right of confiscation of enemies’ debts. Vattel has been supposed to be the most favorable to the new doctrine. He certainly does not deny the right to confiscate ; and if he may be thought to hesitate in admitting it, nothing more can be gathered from it, than that he considers that, in the present times, a relaxation of the rigor of the law has been in practice among the sovereigns of Europe. Vattel, lib. 3, oh. 5, § 77. Surely, a relaxation of the law, in practice, cannot be admitted to constitute an abolition in principle, when the principle is asserted, so late as 1737, by Bynkershoek, and the relaxation shown by Vattel in 1775. In another place, however, Vattel, speaking on the subject of reprisals, admits the right to seize the property of the nation or its subjects, by way of reprisal, and, if war ensues, to confiscate the property so seized. The only exception lie makes, is, of property which has been deposited in the hands of the nation, and entrusted to the public faith ; as is the case of property in the public funds. Vattel, lib. 2, ch. 18, § 342-44. The very exception evinces pretty strongly the opinion of Vattel as to the general rule. Of the character of Vattel as a jurist, I shall not undertake to express an opinion. That he has great merit is conceded ; though a learned civilian, Sir James Mackintosh, informs us, that he has fallen into great mistakes in important “practical discussions of public law.” ■*Discourse on the Law of Nations, p. 32, note. But if he is singly to be opposed to the weight of Grotius and Puffendorf, and above all *- Bynkershoek, it will be difficult for him to sustain so unequal a contest.
“ I have been pressed with the opinion of a very distinguished writer of our own country on this subject. Camillus, No. 18 to 23, on the British Treaty of 1794. I admit, in the fullest manner, the great merit of the argument which he has adduced against the confiscation of private debts due to enemy subjects. Looking to the measure, not as of strict right, but as of sound policy and national honor, I have no hesitation to say, that the argument is unanswerable. He proves incontrovertibly, what the highest interest of nations dictates, with a view to permanent policy: but I have not been able to perceive the proofs by which he overthrows the ancient principle. *91 In respect to the opinion of Grotius, quoted by him in No. 20, as indicating a doubt by Grotius of his own principles, I cannot help thinking, that the learned writer has himself fallen into a mistake. Grotius, in the place referred to (lib. 8, ch. 20, § 16), is not adverting to the right of confiscation, but merely to the general results of a treaty of peace. He says (§ 15), that, after a peace, no action lies for damages done in the war ; but (§ 16) that debts due before the war are not, by the mere operations of the war, released, but remain suspended during the war, and the right to recover them revives at the peace. It is impossible to doubt the meaning of Grotius, when the preceding and succeeding sections are taken in connection. Grotius, therefore, is not inconsistent with himself, nor is ‘ Bynkershoek more inconsistent’; for the latter exjxlicitly avows the same doctrine, but considers it inapplicable to debts confiscated during the war ; for these are completely extinguished. Bynk. Quaast. Pub. Juris, ch. 7.
“ It is supposed by the same learned writer, that the principle of confiscating debts had been abandoned for more than a century. That the practice was intermitted, is certainly no very clear proof of an abandonment of the principle. Motives of policy and the general interests of commerce may combine to induce a nation not to enforce its strict rights, but it ought not, therefore, to be construed to release them. It may, however, be well *142l doubted, if the practice is quite so uniform as it is supposed. *The case of the Silesia loan, which exercised the highest talents of the English nation, is an instance to the contrary, almost within half a century (in 1752). In the very elaborate discussions of national law to which that case gave birth, there is not the slightest intimation, that the law of nations prohibited a sovereign from confiscating debts due to his enemies, even where the debts were due from the nation ; though there is a very able statement of its injustice in that particular case : and the English memorial admits, that when sovereigns or states borrow money from foreigners, it is very commonly expressed in the contract, that it should not be seized as reprisals, or in case of war. Now, it strikes me, that this very circumstance shows in a strong light the general opinion as to the ordinary right of confiscation.
The stipulations of particular treaties of the United States have been cited, in corroboration of their general doctrine, by the claimant’s counsel. These treaties cex-tainly show the opinion of the government as to the impolicy of enforcing the x-ight of confiscation against debts and actions. See Treaty with Great Britain, 1794, ax-t. 10 ; with France 1778, art. 20 ; with Holland, 8th October 1782, art. 18 ; with Prussia, 11th July 1799, art. 23 ; with Morocco, 1787, art. 24. But I cannot admit them to be evidence for the purpose for which they have been introduced. It may be argued, with quite as much, if not greater fox-ce, that these stipulations imply an acknowledgment of the general right of confiscation, and provide for a liberal relaxation between the parties. I hold, with Bynkershoek (Qusest. Pub. Jur. ch. 7), that where such treaties exist, they must be observed ; whex'e there are none, the gexxeral right prevails.
“ It has beeix further supposed, that the common law of England is against the right of confiscating debts; and the declaration of Magna Charta, ch. 30, has been cited, to show the liberal views of the British constitution. This declaration, so far as is necessary to the present purpose, is *92 as follows : ‘ If they (i. e., foreign merchants) be of a land making war against us,'and be found in our realm, at the beginning of the war, they shall be attached, without harm of body or goods (rerum), until it be known unto us, or our chief justice, how our merchants be entreated, then, in the land making war against us, and if our merchants be well entreated there, theirs shall be likewise with us.’ I *quote the translation of Lord r*^g Coke (2 Inst. 27). This would certainly seem to be a very liberal L provision ; and if its true construction app lied to all property and persons, as well transiently in the country, as domiciled and fixed there, it would certainly be entitled to all the encomiums which it has received. Montesq. Spirit of Laws, lib. 20, ch. 14. How far it is now considered as binding, in relation to vessels and goods found within the realm, at the commencement of the war, I shall hereafter consider. It will be observed, however, that this article of Magna Charta, does not protect the debts or property of foreigners who are without the realm : it is confined to foreigners within the realm, upon the public faith on the breaking out of the war. Now, it seems to be the established rule of the common law, that all choses in action, belonging to an enemy, are forfeitable to the crown ; and that the crown is at liberty, at any time during the war, to institute a process, and thereby appropriate them to itself. This was the doctrine of the year books, and stands confirmed by the solemn decision of the exchequer, in the Attorney-General v. Weeden, Parker 267, Maynard’s Edw. II., cited Ibid. It is a prerogative of the crown which, I admit, has been very rarely enforced (See Lord Alvanley’s observations in Furtado v. Rodgers, 3 Bos. & Pul. 191) ; but its existence cannot admit of a legal doubt.
“ On a review of authorities, I am entirely satisfied, that, by the rigor of the law of nations and of the common law, the sovereign of a nation may lawfully confiscate the debts of his enemy, during war, or by way of reprisal : and I will add, that I think this opinion fully confirmed by the judgment of the supreme court in Ware v. Hylton, 3 Dall. 199, where the doctrine was explicitly asserted by some of the judges, reluctantly admitted by others, and denied by none.
“ In respect to the goods of an enemy, found within the dominions of a belligerent power, the right of confiscation is most amply admitted by Grotius, and Puffendorf, and Bynkershoek, and Burlamaqui, and Rutherforth and Vattel. See Grotius, and Puffendorf, and Bynkershoek, ubi supra; and Bynk. Qu. Pub. Jur. c. 4, and 6 ; 2 Burlam, p. 209, § 12, p. 219, § 2, p. 221, § 11 ; Ruth. lib. 2, c. 9, p. 558-73. Such also is the rule of the common law. Hale, in Harg. Law Tracts, p. 245, c. 18. Yattel has indeed contended (and *in this he is followed by Azuni, part 2, ch. 4, art. 2, § 7), that the sovereign declaring war, can neither detain the persons *- nor the property of those subjects of the enemy who are within his dominions at the time of the declaration, because they came into the country upon the public faith. This exception (which, in terms, is confined to the property of persons who are within the country) seems highly reasonable in itself, and is an extension of the rule in Magna Charta. But, even limited as it is, it does not seem followed in practice ; and Bynkershoek is an authority the other way. Bynk. Qusest. Pub. Jur. c. 2, 3, 7. In England, the provision in Magna Charta seems, in practice, to have been confined to foreign merchants domiciled there; and not extended to others who came to *93 ports of the realm for occasional trade. Indeed, from the language of some authorities, it would seem, that the clause was inserted, not so much to benefit foreign merchants, as to provide a remedy for their own subjects, in cases of hostile injuries in foreign countries. (See the opinion of Ch. J. Lee in Key v. Pearse, cited 2 Doug. 606-7.) However this may be, it- is very certain, that Great Britain has uniformly seized, as prize, all vessels and cargoes of her enemies, found afloat in her ports, at the commencement of war. Nay, she has proceeded yet further, and in contemplation of hostilities, laid embargoes on foreign vessels and cargoes, that she might, at all events, secure the prey. It cannot be necessary for me to quote authorities on this point. In the articles respecting the droits of admiralty in 1665, there is a very formal recognition of the rights of the crown to all vessels and cargoes seized before hostilities. The Rebeckah, 1 Rob. 227, and Ibid. 230, note a. This exercise of hostile right — of the summum jus, is so far, indeed, from being obsolete, that it is in constant operation, and in the present hostilities, has been applied to the property of the citizens of the United ■States. Of a similar character, is the detention of American seamen found in her service at the commencement of the war, as prisoners of war ; a practice which violates the spirit, though not the letter, of Magna Charta; and ■certainly, can, in equity and good faith, find few advocates. Of the right ■of Great Britain thus to seize vessels and cargoes found in her ports, on the breaking out of war, I do not find any denial in authorities which are *1451 *ent^e(^ to mu°b weight; and I, therefore, consider the rule of the J law of nations to be, that every such exercise of authority is lawful, and rests in the sound discretion of the sovereign of the nation.
“ The next question is, whether congress (for with them rests the sovereignty of the nation as to the right of making war, and declaring its limits and effects) have authorized the seizure of enemies’ property afloat in our ports? The act of 18th June 1812, ch. 102, is in very general terms, declaring war against Great Britain, and authorizing the president to employ the public forces to carry it into effect. Independent of such express authority, I think, that, as the executive of the nation, he must, as an incident of the office, have a right to employ all the usual and customary means acknowledged in war, to carry it into effect. And there being no limitation in the act, it seems to follow, that the executive may authorize the capture of all enemies’ property, wherever, by the law of nations, it may be lawfully seized. In cases where no grant is made by congress, all such captures, made under the authority of the executive, must inure to the use of the government. That the executive is not restrained from authorizing captures on land, is clear, from the provisions of the act. He may employ and actually has employed the land forces for that purpose ; and no one has doubted the legality of the conduct. That captures may be made, within our own ports, by commissioned ships, seems a natural result of the language — of the generality of expression in relation to the authority to grant letters of marque and reprisal to private armed vessels, which the act does not confine to captures on the high seas, and is supported by the known usage of Great Britain in similar cases. It would be strange, indeed, if the executive could not authorize or ratify a capture in our own ports, unless by granting a commission to a public or private ship. ■ I am not bold enough to interpose a limitation, where congress have not chosen to made one; and I hold, that, by *94 the act declaring war, the executive may authorize all captures which, by the modern law of nations, are permitted and approved. It will be at once perceived, that in this doctrine I do not mean to include the right to confiscate debts due to enemy subjects. This, though a strictly ^national , ~ right, is so justly deemed odious in modern times, and is so generally L discountenanced, that nothing but an express act of congress would satisfy my mind, that it ought to be included among the fair objects of warfare ; more especially, as our own government have declared it unjust and impolitic. But if congress should enact such a law, however much I might regret it, I am not aware, that foreign nations, with whom we have no treaty to the contrary, could, on the footing of the rigid law of nations, complain, though they might deem it a violation of the modern policy.
“ On the whole, I am satisfied, that congress have authorized a seizure and condemnation of enemy property, found in our ports, under the circumstances of the present case. And the executive may lawfully authorize proceedings to enforce the confiscation of the same property, before the proper tribunals of the United States. The district-attorney is, for this purpose, the proper agent of the executive and of the United States. From the character and duties of his station, he is bound to guard the rights of the United States, and to secure their interests. Whenever he chooses to institute proceedings on behalf of the United States, it is presumed by courts of law, that he has the sanction of the proper authorities ; and that presumption will avail, until the executive of the legislature disavow the proceedings, and sanction a restoration of the property.
“ I have taken up more time than I. originally intended, in discussing the various subjects submitted in the argument. An apology will be found in their extraordinary importance. If I shall have successfully shown that the principles of prize law, as admitted in England and in the United States, have the sanction of the principles of public law and public jurists, I shall not regret the labor that has been employed, although, in this particular case, I may pronounce an erroneous sentence.
“ I reverse the decree of the district court, and condemn the 550 tons of timber to the United States ; subject, however, to the right of the owners of the Emulous to a reimbursement of their actual charges and expenses for the custody of the property, which I shall reserve for further consideration; and I shall order the said ^property to be sold, and the proceeds p¡. brought into court to abide the further order of the court.” L
Such is the opinion which I had the honor to pronounce in the circuit court; and upon the most mature reflection, I adhere to it. The argument in this court, urged on behalf of the claimant, has put in controversy the same points which were urged before me. But as the opinion of this court admits many of the principles for which I contended, I shall confine my additional remarks to such as have been overruled by my brethren.
It seems to have been taken for granted, in the argument of counsel, that the opinion held in the circuit court proceeded, in some degree, upon a supposition that a declaration of war operates per se an actual confiscation of enemy’s property found within our territory. To me, this is a perfectly novel doctrine. It was not argued, on either side, in the circuit court, and certainly, never received the slightest countenance from the court. I disclaim, therefore, any intention to support a doctrine which I always sup *95 posed to be wholly untenable. I go yet further, and admit that a declaration of war does not, of itself, import a confiscation of enemies’ property, within or without the country, on the land or on the high seas. The title of the enemy is not by war divested, but remains in proprio vigore, until a hostile seizure and possession has impaired his title. All that I -contend for is, that a declaration of war gives a rig'ht to confiscate enemies’ property, and enables the power to whom the execution of the laws and the prosecution of the war are confided, to enforce that right. If, indeed, there be a limit imposed as to the extent to which hostilities may be carried by the executive, I. admit, that the executive cannot lawfully transcend that limit ; but if no such limit exist, the war may be carried on according to the principles of the modern law of nations, and enforced when, and where, and on what property, the executive chooses.
In no act whatsoever, that I recollect, have congress declared the confiscation of enemies’ property. They have authorized the president to grant letters of marque and general reprisal, which he may revoke and annul *1481 *a’*; kis pleasure : and even as to captures actually made under such J commissions, no absolute title by confiscation vests in the captors, until a sentence of condemnation. If, therefore, British property had come into our ports, since the war, and the president had declined to issue letters of marque and reprisal, there is no act of congress which, in terms, declares it confiscated and subject it to condemnation. If, nevertheless, it be confiscable, the right of confiscation results, not from the express provisions of any statute, but from the very state of war, which subjects the hostile property to the disposal of the government. But until the title should be divested by some overt act of the government, and some judicial sentence, the property would unquestionably remain in the British owners, and if a peace should intervene, it would be completely beyond the reach of subsequent condemnation. There is, then,-no distinction recognised by any act of congress, between enemies’ property which was within our ports, at the commencement of war, and enemies’ property elsewhere. Neither are declared ipso facto confiscated; and each, as I contend, are merely confiscable.
I will now consider what, in point of law, is the oj>eration of the acts of congress made in relation to the present war. The act of 18th June 1812, ch. 102, declares war to exist between Great Britain and the United States, and authorizes the president of the United States to use the land and naval force of the United States to carry the same into effect; and further authorizes him to issue letters of marque, &c., to private armed vessels, against the vessels, goods and effects of the government of Great Britain and the subjects thereof. The prize act of 26th June 1812, ch. 107, confers the po wer on the president to issue instructions to private armed vessels, for the regulation of their conduct. The act of 6th July 1812, ch. 128, authorizes the president to make regulations, &c., for the support and exchange of prisoners of war. The act of 6th July 1812, ch. 129, respecting trade with *1491 eneniy> authorizes the president *to grant passports for the prop-J erty of British subjects within the limits of the United States, during the space of six months, and protects certain British packets, &c., with dispatches, from capture. The act of 3d March 1813, ch. 203, vests in the president the power of retaliation for any violation of the rules and usages of civilized warfare by Great Britain.
*96 These are all the acts which confer powers, or make provisions, touching the management of the war. In no one of them is there the slightest limitation upon the executive powers growing out of a state of war ; and they exist, therefore, in their full and perfect vigor. By the constitution, the executive is charged with the faithful execution of the laws ; and the language of the act declaring war authorizes him to carry it into effect. In what manner, and to what extent, shall he carry it into effect ? What are the legitimate objects of the warfare which he is to wage ? There is no act of the legislature defining the powers, objects or mode of warfare : by what rule, then, must he be governed ? I think, the only rational answer is, by the law of nations as applied to a state of war. Whatever act is legitimate, whatever act is approved by the law, or hostilities among civilized nations, such he may, in his discretion, adopt and exercise; for with him the sovereignty of the nation rests, as to the execution of the laws. If any of such acts are disapproved by the legislature, it is in their power to narrow and limit the extent to which the rights of war shall be exercised; but until such limit is assigned, the executive must have ail the right of modern warfare vested in him, to be exercised in his sound discretion, or he can have none. Upon what principle, I would ask, can he have an implied authority to adopt one and not another ? The best manner of annoying, injuring and pressing the enemy, must, from the nature of things, vary under different circumstances ; and the executive is responsible to the nation for the faithful discharge of his duty, under all the changes of hostilities.
But it is said, that a declaration of war does not, of itself, import a right to confiscate enemies’ property found within the country at the commencement of war. I cannot admit this position in the extent in-which it is *laid down. Nothing, in my judgment, is more clear from author- L ity, than the right to seize hostile property afloat in our ports at the commencement of war. It is the settled practice of nations, and the modern rule of Great Britain herself, applied (as appears from the affidavits in this very cause) to American property in the present war ; applied also to property not merely on board of ships, but to spars floating alongside of them. I forbear, however, to press this point, because my opinion in the court below contains a full discussion of it.
It is also said, that a declaration of war does not carry with it the right to confiscate property found in our country at the commencement of war, because the constitution itself, in giving congress the power “to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water,” has clearly evinced, that the power to declare war did not, ex vi terminorum, include a right to capture property everywhere, and that the power to make rules concerning captures on land and water, may well be considered as a substantive power, as to captures of property within our own territory. In my judgment, if this argument prove anything, it proves too much. If the power to make rules respecting captures, &c., be a substantive power, it is equally applicable to all captures, wherever made, on land or on water. The terms of the grant import no limitation as to place ; and I am not aware, how we can place around them a narrower limit than the terms import. Upon the same construction, the power to grant letters of marque and reprisal is a substantive power ; and a declaration of war could not, of itself, authorize any seizure whatsoever of hostile *97 *151] property, unless this power was called into exercise. I cannot, therefore, yield assent to this argument. The power to declare war, in my opinion, includes all the powers incident to war, and necessary to carry it into effect. If the constitution had been silent as to letters of marque and captures, it would not have narrowed the authority of congress. The authority to grant letters of marque and reprisal, and to regulate captures, are ordinary and necessary incidents to the power of declaring war. It would be utterly ineffectual without them. The expression, therefore, of that which is implied in the very nature of the grant, cannot weaken the ’“force of the grant itself. The words are merely explanatory, and introduced ex ábundanti cautela. It might as well contended, that the power “ to provide and maintain a navy,” did not include the power to regulate and govern it, because there is in the constitution an express provision to this effect. And yet I suppose, that no person would doubt, that congress, independent of such express provision, would have the power to regulate and govern the navy ; and if they should authorize the executive “ to provide and maintain a navy,” it seems to me as clear, that he must have the incidental power to make rules for its government. In truth, it is by no means unfrequent in the constitution, to add clauses of a special nature to general powers which embrace them, and to provide affirmatively for certain powers, without meaning thereby to negative the existence of powers of a more general nature. The power to provide “ for the common defence and general well-fare,” could hardly be doubted to include the power “ to borrow money ; ” the power “to coin money,” to include the power “to regulate the value thereof ; ” and the power “ to raise and support armies,” to include the power “ to make rules for the government and regulation ” thereof. On the other hand, the affirmative power “ to define and punish piracies and felonies committed on the high seas,” has never been supposed to negative the right to punish other offences on the high seas ; and congress have actually legislated to a more enlarged extent. I cannot, therefore, persuade myself that the argument against the doctrine for which I contend, is at all affected by any provision in the constitution.
The opinion of my brethren seems to admit, that the effect of hostilities is to confer all the rights which war confers ; and it seems tacitly to concede, that, by virtue of the declaration of war, the executive would have a right to seize enemies’ property which should actually come within our territory during the war. Certainly, no such power is given directly by any statute. And if the argument be correct, that the power to make captures on land or water must be expressly called into exercise by congress, before the executive can, even after war, enforce a capture and condemnation, it will be very „. kqi t0 support the concession. Suppose, a ’“British ship of war J or merchant ship should now come within our ports, there is no statute declaring such ship actually confiscated. There is no express authority either for the navy or army to make a capture of her ; and although the executive might authorize a private armed ship so to do, yet it would depend altogether on the will of the owners of the ship, whether they would do so or not. Can it be possible, that the executive has not the power to authorize such seizure ? And if he may authorize a seizure by the army or navy, why not by private individuals, if they will, volunteer for the purposes
The act declaring war has authorized the executive to employ the land *98 and naval force of the United States, to carry it into effect. When and where shall he carry it into effect ? Congress have net declared, that any captures shall be made on land ; and if this be a substantive power, not included in a declaration of war, how can the executive make captures on land, when congress have not expressed their will to this effect ? The power to employ the army and navy might well be exercised in preventing invasion, and in the common defence, without necessarily including a right to capture, if the right to capture be not an incident of war : and upon what ground, then, can the executive plan and execute foreign expeditions or foreign captures ? Upon what ground he can authorize a Canadian campaign, or seize a hostile fort or territory, and occupy it by right of capture and conquest, I am utterly at a loss to perceive, unless it be, that the power to carry the war into effect, gives every incidental power which the law of nations authorizes and approves in a state of war. I am at a loss to perceive how the power exists, to seize and capture enemy’s property, which was without our territory, at the commencement of the war, and not the power to seize that which was within our territory, at the same period. Neither are expressly given nor denied (except as to private armed ships), and how can either be assumed, except as an incident of war, acknowledged upon national and public principles ? It may be suggested, that the executive, “ as commander-in-chief of the army and navy,” has the power to make foreign conquests. But this is utterly inadmissible, if the right to authorize captures resides as a substantive power in congress, *and does not follow as an incident of a declaration of war : and certainly, the i-ights of the L “ commander-in-chief ” must be restrained to such acts as are allowed by the laws. Besides, the same difficulty meets us here as in the fox-mer case ; if his powex-s, as commander-in-chief, authox-ize him to make captures, without the territory, why not, within' the territory ?
The acts respecting alien enemies and prisoners of war, have been supposed, even in a state of actual war, to confer new powers on the executive. I cannot accede to the inference, in the extent to which it is claimed. In general, these acts may be deemed mere regulations of wax-, limiting and directing the discretion of the executive ; and it cannot be doubted, that congress had a perfect right to prescribe such regulations. To regulate the exercise of the rights of war as to enemies, does not, however, imply that such rights have not an independent existence. Besides, it is cleax-, that the act respecting alien enemies applies only to aliens resident within the coxxntry ; and not to the property of aliens, wlio are not so resident. I might answer, in the same manner-, the ai-gument dx-awn from the act of 6th July 1812, ch. 129, § 4, and the act of 3d of March 1813, ch. 203. But even admitting that these acts did confer some new powers, still, as these powers do not respect the present case, I cannot consider them, as affording even a legislative implication against the existence of the powers for which I contend.
It has been supposed, that my opinion assumes for its basis, the position, that modern usage constitutes a rule which acts directly on the thing itself, by its own force, and not through the sovereign power. Certainly, I do not admit this supposition to be correct. My argument proceeds upon the ground, that when the legislative authority, to whom the right to declare war is confided, has declared war in its most unlimited mannex-, the executive authority, to whom the execution of the war is confided, is bound to carry it *99 into effect. He has a discretion vested in him, as to the manner and extent; but he cannot lawfully transcend the rules of warfare established among civilized nations. He cannot lawfully exercise powers, or authorize proceedings, which the civilized world repudiates and disclaims. The sovereignty, *1541 *as t0 ^ec^aring war and limiting its effects, rests with the legislature. J The sovereignty, as to its execution, rests with the president. If the legislature do not limit the nature of the war, all the regulations and rights of general war attach upon it. I do not, therefore, contend, that modern usage of nations constitutes a rule acting on enemies’ property, so as to produce confiscation of itself, and not through the sovereign power : on the contrary, I consider enemies’ property, in no case whatsoever, confiscated by the mere declaration of war ; it is only liable to be confiscated, at the discretion of the sovereign power having the conduct and execution of the war. The modem usage of nations is resorted to, merely as a limitation of this discretion, not as conferring the authority to exercise it. The sovereignty to execute it, is supposed already to exist in the president, by the very terms of the constitution : and I would again ask, if this general power to confiscate enemies’ property does not exist in the executive, to be exercised in his discretion, how is it possible, that he can have authority to seize and confiscate any enemies’ property coming into the country since the war, or found in the enemies’ territory? Yet, I understood the opinion of my brethren to proceed upon the tacit acknowledgment, that the executive may seize and confiscate such property, under the circumstances which I have stated.
On the whole, I am still of opinion, that the judgment of the circuit court was correct, and ought to be affirmed. It is due, however, to myself, to state, that, at the trial in the circuit court, it was agreed, that the timber had always been afloat on tide-waters; and the affidavit by which it is proved to have rested on land at low tide, was not taken, until after the hearing and decision of the cause. In the opinion which I have expressed, I am authorized to state, that I have the concurrence of one of my brethren.
Sentence reversed.